IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

THOMAS L. BOGGIO,

                    Plaintiff,

        Vs.                                        No. 07-4067-SAC

HARTFORD LIFE AND ACCIDENT
INSURANCE COMPANY,

                    Defendant.

MEMORANDUM AND ORDER

        The plaintiff Thomas L. Boggio ("Boggio") brings this action

under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29

U.S.C. § 1132(a), challenging the plan administrator's decision to terminate

his long-term disability benefits and seeking reinstatement of his benefits.

The case comes before the court on cross motions for summary judgment.

The defendant Hartford Life and Accident Insurance Company ("Hartford")

has filed a motion for summary judgment, (Dk. 28), so has the plaintiff (Dk.

30).  Both motions are fully briefed and ready for decision.

        The parties filed a joint stipulation to the administrative record.

(Dk. 25).  Their joint motion to have this voluminous record filed

conventionally was granted.  (Dk. 26).  While agreeing on the contents of

the record, the parties' filings present the relevant facts in a manner easily

described as overly contentious.  These filings unnecessarily burden the court in several respects. They are replete with repetitive arguments.  They purport to controvert facts but only challenge unstated inferences.  Their scope and length exceed what is needed to inform the court of their respective positions.  The court understands this problem is due in part to the procedural difficulties created by the summary judgment format.

**FACTS**

The plaintiff, Thomas Boggio, is a 55-year-old man who had worked as an administrative coordinator for the engineering firm, Black & Veatch, for 28 years from 1976 until August 18, 2004.  He participated in a group disability plan ("GDP") offered by his employer, Black & Veatch.  The plan administrator is Black & Veatch Holding Company and Named Affiliates.  The GDP is funded by a long-term disability insurance policy issued by Hartford, and Hartford serves as the claims administrator.  The plan administrator "and other [p]lan fiduciaries have discretionary authority to interpret the terms of the Plan and to determine eligibility for and entitlement to benefits in accordance with the Plan."  (Dk. 27,  Admin. Rec. ("AR") at A0037).

The GDP provides benefits to an employee who is disabled or

2

has a disability as defined by meeting the "Occupation Qualifier or the

Earnings Qualifier."  The GDP defines an "Occupation Qualifier" in these

terms:

> "*Disability*" means that during the *Elimination Period* and the following
> 24 months, *Injury* or *Sickness* causes physical or mental impairments
> to such a degree of severity that *You* are:
> 1. continuously unable to perform the *Material and Substantial Duties
> of Your Regular Occupation*; and
> 2. not working for wages in any occupation for which *You* are or
> become qualified by education, training or experience.
>     . . . .
> After the *Monthly Benefit* has been payable for 24 months, "Disability"
> means that *Injury* or *Sickness* causes physical or mental impairment
> to such a degree of severity that *You* are:
> 1. continuously unable to engage in any occupation for which *You* are
> or become qualified by education, training or experience; and
> 2. not working for wages in any occupation for which *You* are or
> become qualified by education, training or experience.

(AR at A0025).  The GDP requires as part of the proof of loss that the

employee submit "[o]bjective medical findings which support *Your*

*Disability.*  Objective medical findings include but are not limited to tests,

procedures, or clinical examinations standardly accepted in the practice of

medicine, for *Your* disabling condition(s)."  (AR at A0033).

The plaintiff's primary job duties as an administrative

coordinator were described as:

> Responsible for timely, efficient, and accurate processing of Accounts
> Payable (A/p), Expense Reports, and cost information.  Interact with

> Dept. Management, project management, procurement, project
> controls, construction site personnel, and approvers and department
> personnel.  Also assists with development and administration of
> policies and procedures.  Works under frequent supervision.

(AR at C0872).  The physical demands for an administrative coordinator

involved sitting mostly but also a significant amount of walking and some

standing.  Other physical demands were frequent keyboarding and related

hand and head movements, and less frequent demands were stooping,

kneeling, bending, and reaching with shoulders.

On filed reports, Boggio indicated he was first treated for

vertigo problems in May of 2003.  He was off work from April 23, 2004,

through June 1, 2004, for these problems.  The plaintiff stopped working on

August 18, 2004, due to complaints of persisting and disabling vertigo.

Boggio signed his application for long-term disability benefits on August 31,

2004.  He claimed to be disabled as of August 19, 2004, and described his

sickness/injury as "severe vertigo--interferes with all aspects of work and

life in general."  (AR at C0866).

John J. Mahon, M.D. completed a treating physician's

statement on September 2, 2004.[1]  (AR at C0001).  He notes that

_____

[1]The defendant purports to controvert the plaintiff's statement of facts
regarding this report with later statements made by Dr. Mahon and with
later evaluations made by other physicians.  None of what the defendant

4

symptoms first appeared in May of 2003 and that he first advised the

patient to cease work in April of 2003.  The diagnosis was "severe vertigo"

with a "whirling sensation" based on the "objective findings" of Boggio

being "unsteady on his feet" and an "abnormal ENG."  (AR at C0001).

Boggio was referred to three other physicians and was treated with two

medications.  Dr. Mahon recorded that Boggio's vertigo affected "all

aspects of his life" and that the prognosis was poor.  Dr. Mahon opined:

"We are at a diagnostic and therapeutic end of the road.  He has had a

complete ENT and neurology evaluations.  He has failed Meclizine, Valium

and vestibular rehab."  (AR at C0002).  On November 2, 2004, Dr. Mahon

_____

offers or argues controverts the fact that Dr. Mahon completed the
September 2, 2004, report as set forth in the plaintiff's motion.  The
defendant's three-pages of counter-designations and arguments were not
proper attempts at controverting this report.  The defendant certainly may
argue the relative weight of this report and its findings, but this is not a
matter of controverting the fact of this report and its contents.  Blame for
this situation rests in part on the inappropriate nature of the summary
judgment motion as the procedural tool for reviewing the denial of benefits
under ERISA.  *See Dore v. Sun Life Assur. Co. of Canada*, 2007 WL
2725976 at *1 (D. Kan. 2007); *Panther v. Sun Life Assurance Co. of Can.*,
464 F. Supp. 2d 1116, 1121 (D. Kan. 2006) (citing *Olenhouse v.
Commodity Credit Corp.*, 42 F.3d 1560, 1579 (10th Cir. 1994)).  For the
sake of clarity and brevity, the court will use the parties' statements of fact
principally as a guide for locating the different reports and documents and
then for establishing a relevant order to the facts appearing in the same.
The facts appearing in this order are taken primarily from the face of the
reports and documents included in the administrative record.

completed a functional assessment tool answering that the plaintiff was not

"currently capable of performing work at this time which is primarily seated

in nature with the option to sit/stand as needed with no lifting, pushing,

pulling, or climbing."  (AR at C0635).  With regards to specific restrictions,

Dr. Mahon noted "no prolonged standing, avoid ladders."  *Id*.

On Dr. Mahon's referral, Boggio first saw Mark J. Maslan, M.D.

on July 11, 2003.  Dr. Maslan recorded subjective complaints of "vertigo

since May 13, 2003," after a severe headache with ongoing dizziness and

"true vertigo with head motion."  (AR at C0626).  On July 22, 2003, Dr.

Maslan noted that Boggio reported no improvement in symptoms and that

the "ENG was non-localizing."  (AR at C0625).  The neurophysiology report

on the ENG reviewed by Dr. Maslan noted that there were no

abnormalities.  (AR at C0629).  Dr. Maslan recorded his assessment as

"[d]isequilibrium and some degree of vertigo" and ordered an MRI.  *Id*.  On

August 2, 2003, Dr. Maslan saw Boggio who described a "constant

sensation of being off balance" but denied "any severe episodes of vertigo."

 (AR at C0624).  Dr. Maslan reviewed the MRI results which did not "reveal

any congenital abnormalities of the vestibular cochlear system."  *Id*.  The

MRI report included an impression that the MRI of the internal auditory

6

canals was "unremarkable."  (AR at C0628).  Dr. Maslan directed Boggio to

"undergo vestibular rehab" and to return in six weeks.  (AR at C0624).  On

September 16, 2003, Boggio returned and reported "minimal if any

significant improvement" from the vestibular rehab.  (AR at C0623).  Dr.

Maslan's assessment was "vertigo secondary to hearing loss" and

discussed a labyrinthectomy procedure as an option for Boggio's

consideration.  *Id.*

Boggio received vestibular rehabilitation from August through

November of 2003.  His discharge summary from this treatment included a

section that scored his results on a dizziness handicap inventory, gait

index, balance confidence scale and motion sensitivity quotient.  The

assessment observed that there had been "little reduction in baseline or

motion provoked dizziness and in visually provoked dizziness. He

continued to be challenged in complex environments."  (AR at C0641).

On Dr. Mahon's referral, Boggio was seen by Charles M.

Luetje, M.D. at the Otologic Center on December 18, 2003.  Dr. Luetje sent

a letter to Dr. Mahon with a summary of the plaintiff's subjective complaints

and said he would repeat the ENG and review the results.  Dr. Luetje later

reviewed the results with Boggio and wrote Dr. Mahon the following in

January of 2004:

> I was impressed that he had very brisk responses to caloric stimulation. The right ear demonstrated significantly more response to warm caloric stimulation.  There was no spontaneous nystagmus. I think this is a manifestation of resolving inner ear dysfunction.  I do not believe that there is really an abnormality here that needs medicine, or any further evaluation.
> Since he is getting better, as I would expect, I want him to continue doing some vestibular ocular reflex exercises.  Over a period of 10 to 18 months I think his symptoms will almost totally disappear.

(AR at C0719).  After seeing Boggio in June of 2004, Dr. Luetje wrote Dr. Mahon that the plaintiff was "a nervous wreck," that "he has vestibular dysfunction," and that he experiences "visually induced dysequilibrium" while "at his computer looking up and down."  (AR at C0814).  In the same letter, Dr. Luetje described the medications he was prescribing for the Boggio's condition.  Dr. Luetje completed a functional assessment tool dated November 19, 2004, indicating that he did not believe Boggio could perform sedentary work.  (AR at C0198).  Dr. Luetje further noted from "the symptoms" described in a fax from Boggio that he "has considerable disability of dysequilbrium that is aggravated by visual input and movement" and "until this is resolved he will not be effective at the work he is doing."  *Id.*

On a consultation request from Dr. Mahon, Boggio was seen in

8

May of 2004 by a neurologist, George Moreng, M.D.  Notes of the physical

examination showed the plaintiff's gait to be "a bit unsure/unsteady."  (AR

at C0759).  Dr. Moreng's impression was "unremitting vertigo with sudden

onset one year ago," and his plans were for MRIs of the brain and

cerebrovascular circulation and neurophysiologic testing.  *Id.*  Following the

MRIs and tests, Dr. Moreng wrote Dr. Mahon that lab testing was

"unrevealing," "EEG was normal," and the "minimal evidence for

cerebrovascular small vessel ischemia . . . does not explain his vertigo."

(AR at C0823 and C0824).

   The GDP required Boggio to supply proof that he had "applied

for other Deductible Income Benefits such as Workers' Compensation or

Social Security *Disability* Benefits."  (AR at A0033).  Boggio was also

required to notify Hartford if he was awarded "other Deductible Income

Benefits."  *Id.*  On November 17, 2004, Boggio notified Hartford that the

Social Security Administration ("SSA") had determined that he was

disabled as of April 23, 2004, and that he would be entitled to benefits

beginning in October of 2004.  (AR at C0720-C0721).  The Social Security

determination and award are not discussed nor even mentioned in any of

Hartford's benefit decisions.

9

Retained by Hartford to review the medical records on Thomas Boggio, to comment on Dr. Mahon's assessment of restrictions and limitations and to offer his own suggested restrictions and limitations based on his review of the medical information, Todd Lyon, M.D. issued a written medical report dated December 15, 2004.  (AR at C0593).  Dr. Lyon reports a conversation with Dr. Mahon on December 14, 2004, in which Dr. Mahon indicated the following:

> Dr. Mahon indicated that Mr. Boggio had no significant physical exam abnormalities and no significant laboratory test abnormalities.  He indicated that the medical etiology for Mr. Boggio's symptomatic complaints of vertigo and unsteadiness was unknown.  He indicated Mr. Boggio was considered to be an unsuitable candidate for further diagnostic work-up or further treatment options.  He indicated when he observed Mr. Boggio in his office he appeared to move independently.  As far as Dr. Mahon was aware, Mr. Boggio had not had a psychiatric evaluation.  Dr. Mahon indicated there had been no objective change via diagnostic testing or physical exam findings apparent in Mr. Boggio around August of 2004.  Dr. Mahon indicated that he found no medical or objective evidence that would support any specific functional restrictions or limitations in regards to Mr. Boggio's work capacities.

(AR at C0597-C0598).  Dr. Lyon concluded that Dr. Mahon's assessment of Mr. Boggio's functional capabilities was not supported by medical evidence and opined "that there is no medical evidence supporting any specific work-related restrictions or limitations on his functionality."  (AR at C0598-C0599).

10

By letter dated January 14, 2005, Hartford denied Boggio's claim for disability benefits.  It based the denial on its review on the evaluation of the medical records and Dr. Lyon's contact with Dr. Mahon. The denial letter concludes:  "the information fails to demonstrate a basis for functional limitation and impairment that would continuously preclude you from performing the material and substantial duties of your regular occupation."  (AR at B0097).   The plaintiff requested reconsideration by letter dated January 24, 2005.  (AR at C0563).[2]  Hartford sent a letter dated March 11, 2005, denying Boggio's appeal.  The letter explained the reasons for rejecting the opinions of Dr. Mahon and Dr. Luetje and for agreeing with Dr. Lyon's report and conclusion.  (AR at C0523-C0524). The letter further indicated that the plaintiff had exhausted his administrative remedies and that he could bring a civil action.

In a letter dated April 13, 2005, Boggio wrote the Kansas Insurance Commissioner complaining about the defendant's handling of his claim for long-term disability benefits.  The Commissioner directed the complaint to Hartford for a response which it provided in a letter dated April

---

[2]The record includes a note by Dr. Mahon on the plaintiff's visit of January 24, 2005.  Dr. Mahon recorded telling the plaintiff that while there was no objective abnormalities on testing the plaintiff's subjective symptoms were sufficiently severe to disable him.  (AR at C0375).

22, 2005.  The Commissioner's office reviewed the matters furnished by

Boggio and Hartford and then directed the defendant to have its medical

consultant contact Dr. Luetje and to reconsider its decision to deny

benefits.  (AR at C0580-C0581).

The defendant wrote the Commissioner on June 3, 2005,

agreeing "that it is important to gather a further understanding from Dr.

Luetje's perspective of Mr. Boggio's condition and functionality."  (AR at

C0579).  The defendant explained it would conduct "a completely new

medical review" with "a medical specialist" and "make every reasonable

attempt to contact Dr. Luetje for further clarification."  *Id.*  Hartford agreed

to furnish the Commissioner with the results of its new medical review.

Hartford contracted with Raquel Ann Redfelt, M.D., an

Otolaryngologist, to review the plaintiff's medical records and advise what

restrictions/limitations would apply to Boggio and whether they would

preclude him from doing his former work.  As set out in her report, Dr.

Redfelt spoke with Dr. Luetje on June 30, 2005:

> He stated that the patient had continued to be symptomatic, that he
> thought that the main disease process was in the patient's pontine
> gaze center which intimately tied with the vestibular system.  That
> explains why the patient's inner ear tests have been normal.  We
> talked briefly about the fact that Thomas feels more grounded when
> pushing a lawn mower than he does when he sitting in a chair looking

from a computer down to a piece of paper.  Dr. Luetje stated that he
though [sic] that Thomas would potentially psychologically benefit
from returning to some type of sedentary work but he did state that
most any head or eye movement aggravates Mr. Boggio's
disequilibrium.  In addition, <u>he commented that there was quite a bit
of psychological overlay</u>, and that it was very hard to see or to
imagine Mr. Boggio in gainful employment.  When asked specifically
what Mr. Boggio's restrictions and limitations were, Dr. Luetje stated
that most any activity exacerbates Mr. Boggio's disequilibrium but
that there was little further treatment that Dr. Luetje had to offer, and
Dr. Luetje thought that addressing Mr. Boggio's psychological issues
may be of use.

(AR at C0422 (underlining added)).  In a separate letter to Dr. Luetje asking

for his signature as acknowledgment to the contents of their conversation,

Dr. Redfelt summarized their conversation in this way:

> As we discussed, Thomas has a central-type disequilibrium, as you
> stated, mostly likely in the pontine gaze center, and that he is coping
> fairly poorly with this disease process.  We discussed the fact that
> head movements and eye movements will provoke further feelings of
> disequilibrium, and that the patient has had a very difficult time
> coping with his disease process.  As we discussed, <u>the amount of
> psychological overlay is always difficult to separate</u> out from the
> underlying disease process.
> We are both in agreement that there is an underlying disease
> process but that the <u>psychological overlay may be the most important
> impediment to his ability to return to gainful employment</u>.  When
> discussing specific restrictions and limitations, you thought that he
> might be able to perform some type of sedentary work that would limit
> head and eye movement.  We also agreed that he may actually
> improve psychologically if he were able to return to some type of
> gainful employment.

(AR at C0425-C0426 (underlining added)).  Dr. Redfelt opined from reading

Boggio's own notes describing his dizziness "that there is significant

psychological overlay."  (AR at C0413).  Dr. Redfelt recognized:

> Back to the questions regarding Mr. Boggio's restrictions/limitations;
> having only the medical record, Mr. Boggio's description and a
> discussion with Dr. Luetje, it is very difficult to accurately assess his
> true restrictions of limitations.  Again, when someone is as
> psychologically disturbed as Mr. Boggio is by his feelings of
> disequilibrium, it can become impossible for them to see any normal
> activity as anything but an insurmountable task.

(AR at C0414).  Dr. Redfelt concluded that the plaintiff was not precluded

from full-time sedentary work "that would not require much head and eye

movement."  *Id.*

The defendant informed the plaintiff by a letter dated July 22,

2005, that long-term disability benefits were approved.  The defendant

explained:  "Based upon the limited findings it is noted that you would have

difficulty with regards to constant use of the computer that would involve

frequent head and eye movement in part due to your reported symptoms."

(AR at B0084). The letter further stated that this decision did not mean the

Boggio would receive benefits for the maximum payable period and that

the claims team would be requesting updated medical information to

determine continuing eligibility.

In September of 2005, Hartford hired Triad Investigations to

14

conduct surveillance on Boggio to determine his activities and limitations.
(AR at D0333).  The surveillance occurred on September 25 and 26, 2005.
The investigation report states that surveillance observed Boggio
"operating a vehicle, bending, leaning, lifting, carrying, entering/exiting a
vehicle, sitting for approximately 45 minutes, rising to a standing position,
standing for approximately 15 minutes, walking with a brisk pace with and
without a cane, pushing a wheeled trash container to the street and
carrying a trash bag to the street."  (AR at D0334).  The video of this
surveillance is part of the summary judgment record.  (AR at E0001).

        The administrative record includes a letter dated October 22,
2005, from Dr. Mahon stating:  "To whom it may concern, Thomas Boggio
remains completely and permanently disabled due to chronic severe
vertigo."  (AR at C0200).  The plaintiff apparently faxed Dr. Mahon's letter
and Boggio's own "dizziness notes" to the defendant in late October of
2005.

        In December of 2005, Hartford notified Boggio and the treating
physicians, Dr. Mahon and Dr. Luetje, of the surveillance information.  It
provided the physicians with a copy of surveillance CD for the physicians'
"records."  (AR at C0365, C0366).  In a letter dated December 13, 2005,

15

the Boggio complained to the Kansas Insurance Commissioner about the defendant harassing and intimidating him with video surveillance and other investigative contact.  (AR at C0319-C0324).

Also in December of 2005, Hartford retained Brian Mercer, M.D., Board Certified in Neurology, with the University Disability Consortium, to evaluate the plaintiff's medical records and the video surveillance and to assess the plaintiff's current functionality.  Dr. Mercer appears to have reviewed the same medical records considered previously by Dr. Redfelt and also considered the plaintiff's notes dated October 30, 2005 and the surveillance information.  Dr. Mercer contacted Dr. Mahon who "indicated that he does not wish to be involved in the disability determination process."  (AR at C0352).  Dr. Luetje did not return Dr. Mercer's calls.  Dr. Mercer concludes in his report dated December 19, 2005, that Boggio is not precluded from sedentary to light work with restrictions for the following reasons:

> Mr. Boggio complains of significant ongoing symptoms that are exacerbated with looking upwards, bending, being in crowds and use of a computer.  The degree of reported symptoms substantially exceeds the objective findings seen.  His video surveillance shows him to walk without imbalance.  He is seen bending on multiple occasions and walking following the bending maneuvers with no evidence of imbalance.  This is inconsistent with his reported inability to bend and casts doubt on the reliability of his reported symptoms.

16

Although he reports that he generally is active for two hours in the
morning and two hours in the afternoon, it is notable that on 9/25/05
surveillance, he is away from his home for more than eight hours.
The medical records include references to depression as well as
psychological overlay being present.  Due to the absence of
significant ongoing objective abnormalities, inconsistencies between
self-reported capabilities versus those observed on video
surveillance, as well as the references to psychological overlay, the
subjective symptoms substantially exceed objective findings and are
of questionable reliability.

(AR at C0353-C0354).

By letter dated December 20, 2005, the defendant notified

Boggio that benefits would be terminated as of December 31, 2005.  The

letter identifies with some detail the information considered.  The letter

reflects that the defendant's decision was based principally on the new

surveillance information and Dr. Mercer's recent report.  (AD at B0073-

B0076).

The plaintiff wrote letters to the Kansas Insurance

Commissioner in January of 2006 challenging the defendant's latest

reliance on the opinion of a neurologist, Dr. Mercer, rather than the

opinions of the otolaryngologists, Dr. Redfelt and Dr. Luetje.  The

Commissioner forwarded these letters to Hartford for response, and the

defendant did submit detailed responses.  In February of 2006, the

Commissioner inquired whether Hartford would not have a physician

knowledgeable in otolaryngology review the additional information on the
Boggio's claim.  (AD at C0256).

As a result of the Commissioner's inquiry, the defendant
referred the plaintiff's claim for review to Isaac Bloch, M.D., Board Certified
in Otolaryngology, Head and Neck Surgery.  Dr. Bloch was a physician
associated with the University Disability Consortium, like Dr. Redfelt and
Dr. Mercer.  Dr. Bloch issued a report dated March 22, 2006, finding that
"[t]here are no objective findings to substantiate any limitations on the use
of computer or on working in a sedentary occupation at a desk with a
telephone."  (AD at C0244).  Dr. Bloch appears to have reviewed the same
records and information as Dr. Mercer.  Dr. Bloch emphasized:

> Most revealing is the investigative report which shows Mr. Boggio
> conducting his activities without any hesitancy and without any
> evidence of dysequilibrium.  The two days reviewed from the
> investigative report show Mr. Boggio partaking in all of his activities
> without a cane, walk with bags and objects in his arms as well as
> bend over, put them down and pick them back up without any
> difficulty, and most importantly he is noted to be driving without any
> limitations.  Driving itself is one of the most vestibular-taxing activities
> as it requires input from tactile and visual systems that are ongoing
> and constantly changing.  This would be noted to be much more
> stimulating to the vestibular system than working on a computer
> screen or doing light type of work and activity.

(AD at C0243-C0244 (underlining added)).

In May of 2006, Dr. Luetje referred the plaintiff to Hinrich

18

Staecker, M.D. with Kansas University Medical Center ("KUMC"),

Otolaryngology and Head and Neck Surgery, for an evaluation.  Dr. Luetje

noted in his referral letter that Boggio had received disability benefits until

there were the "secret video surveillance" and a report by Isaac Bloch,

M.D., Board Certified in Otolaryngology, indicating no objective evidence

for the plaintiff's symptoms. (AD at C0145).  Dr. Luetje concluded his letter

with:  "I do believe it is time for an independent evaluation of this

gentlemen." *Id.*

In June of 2006, Boggio underwent some additional testing at

the KUMC.  Dr. Hinrich Staecker at KUMC then issued a report that

included the following impression and plan:

> This is a patient complaining of chronic disequilibrium.  His symptoms
> sound similar to those experienced by patients with vestibular
> migraine.  His past testing does not show any evidence of vestibular
> dysfunction and a recent VEMP test showed normal vestibular
> function in both saccules.  Posturography today shows high
> variability, possibly consistent with a physiologic balance behavior.  <u>I
> do believe that Mr. Boggio has an underlying balance problem,
> however, I believe he may be suffering from a conversion type
> disorder that is causing him to have excessive responses to his
> vestibular problem.</u>  I have encouraged him to go on an anti-migraine
> diet and continue with his therapy.  I would not like to put him on
> medications at this point.  Additionally, I would like him to see a
> psychologist to deal with some of his reactions to his underlying
> balance disorder.

(AD at C0136 (underlining added)).

19

The plaintiff appealed the termination of benefits by a letter dated June 14, 2006.  During the review process, Boggio was seen by more physicians, including Neal Deutch, psychologist, who did a neuropsychological assessment, and Dr. Norman Heisler, a psychiatrist, who evaluated Boggio.  Dr. Deutch's diagnostic impressions were "undifferentiated somatoform disorder and anxiety disorder."  (AD at C0063).  Dr. Deutch recommended psychological counseling and a "[p]sychiatric consultation to assist in selection of medication for attention and concentration as well as mood."  *Id*.  In September, Dr. Heisler performed a psychiatric evaluation and concluded:

> Overall, it would <u>not appear that his symptoms are primarily psychiatric</u> and I have not elected treatment.  I did advise him to follow up with a neurologist with special expertise in this area or to return to his ear, nose, and throat doctor.
> It is not clear that psychotropics will alleviate his symptoms and so far his exposure to psychotropic medication seems to have aggravated his symptoms, so I think it is most prudent not to introduce psychiatric medications at this time and defer his treatment to a provider that may have more expertise in this area.

(AD at C0065 (underlining added)).

Hartford secured a final medical review by Randall King, M.D., Board Certified in Neurology, with the University Disability Consortium.  Dr. King's report, dated December 1, 2006, shows he reviewed all prior

medical records, including the recent reports of Dr. Staecker, Dr. Deutch

and Dr. Heisler.  Dr. King's report offers several related conclusions:

> He [Dr.Staecker] did <u>not</u> believe that Mr. Boggio had an underlying
> balance problem.  (C0010).
> Therefore, in the final analysis, the objective data did not posit a
> physiological basis for his vertigo or dizziness, and I would tend to
> agree with Dr. Staecker that this <u>does not have a physiological</u> basis.
> (C0012).
> Dr. Luetje also concurred that there were no objective findings and
> did not have a diagnosis that would explain his dizziness. However,
> he felt because of his symptoms and his perception, he would not do
> well.  (C0012).
> His treating Family Practice doctor really had no explanation and did
> not offer any objective data that would posit a physiological basis.
> Therefore, in the final analysis, my discussions with his physicians
> did not offer any information that would posit a physiological basis. . .
> The physiologic testing and MRI data also argue against a
> physiological basis for dizziness.  Therefore, in the final analysis,
> there is no physiological basis established for his subjective
> complaints of dizziness.  Therefore, there is no objective data that
> would preclude him from working at the light level or in his past
> occupation.  (C0013)
> In the final analysis, Mr. Boggio is a man with chronic vertigo with <u>no</u>
> <u>physiological mechanism demonstrated by physical examination, or</u>
> <u>any objective testing</u>.  The video surveillance clearly demonstrated
> that he was capable of performing his old job.  The psychiatric and
> psychological testing offered different opinions, and therefore, at the
> present time, I am unable to clearly state a psychiatric diagnosis but it
> is quite obvious that at the present time, there is no physiological
> basis for his complaints of dizziness.  (C0013).

(underlining added).  By letter dated December 4, 2006, the plaintiff's

appeal was denied and the decision to terminate benefits was upheld.  (AR

at B0058-B0060).

21

In notes dated June 1, 2006, the plaintiff described his symptoms as severe dizziness and nausea that interferes with the mental activities of reading, listening, thinking, concentration and comprehension. These symptoms make for restless nights, and the nausea is most severe upon waking.  Boggio walks with a "flat-footed shuffle" and with his head down "to block out information" that contributes to dizziness.  (AR at C0143).  Walking "requires . . . total concentration," contributes to his nausea, and causes him to feel as if his head was disconnected from his body.  *Id.*  He uses a cane principally where there are many people or where the visual stimuli are great.  He has stumbled and fallen both at home and in public settings.  The dizziness and nausea make daily activities "a struggle" and tire him easily.  (AR at C0144).  Factors that can aggravate these symptoms are fluorescent lighting, focusing on a computer monitor, rolling in an office chair, and being in a large group setting.

In notes dated November 8, 2004, Boggio described his dizziness and the related flu-like nausea as distracting his "thinking, concentration and comprehension."  (AR at C0161).  Working on his computer spread sheets and entering data elevates his dizziness to the point of falling down and needing a ride home.  He describes increased

symptoms with group meetings or visitors to his work station.  The stress of

work aggravates his symptoms such that he begins "fading out" and

experiences complete physical exhaustion.  *Id.*

In October of 2004, Boggio's supervisor, Theresa Turkington,

told a Hartford representative that Boggio had been having difficulty for the

last 13 to 15 months and that they had provided him a larger monitor and

enlarged the numbers on the monitor.  (AR at C0109).  She described

Boggio's difficulty with focusing and his dizziness from reading and looking

at a computer screen.  Ms. Turkington observed that Boggio balanced

himself against the wall when he walked and that at times he could not

focus on the things required for his job.  She noted that he struggled even

to pay attention to her instructions and that she had to repeat the

instructions two to three times.  Ms. Turkington concluded, "he's just not

the same Tom he used to be."  *Id.*

**MOTIONS FOR SUMMARY JUDGMENT**

Each party presents this case for ruling on its respective

summary judgment motion.  Federal Rule of Civil Procedure 56(c) guides

the court in its determination and permits the entry of summary judgment "if

the pleadings, depositions, answers to interrogatories, and admissions on

file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed.R.Civ.P. 56(c).  There are no genuine issues for trial if the record taken as a whole would not persuade a rational trier of fact to find for the nonmoving party.  *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  In applying this standard, "[a]ll inferences arising from the record before us must be drawn and indulged in favor of the [nonmovant]." *Stinnett v. Safeway, Inc.*, 337 F.3d 1213, 1216 (10th Cir. 2003) (internal quotation marks omitted).  Conclusory allegations alone cannot defeat a properly supported motion for summary judgment. *White v. York Intern. Corp.*, 45 F.3d 357, 363 (10th Cir. 1995).  The nonmovant's "evidence, including testimony, must be based on more than mere speculation, conjecture, or surmise." *Bones v. Honeywell Intern., Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

**STANDARD OF REVIEW**

Deciding on the correct standard of review is the first order of business in reviewing Hartford's decision to terminate benefits.  "A denial of benefits covered by ERISA 'is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary

24

authority to determine eligibility for benefits or to construe the terms of the

plan.'" *Flinders v. Workforce Stabilization Plan of Phillips Petroleum Co.*,

491 F.3d 1180, 1187 (10th Cir. 2007) (quoting *Firestone Tire and Rubber

Co. v. Bruch*, 489 U.S. 101, 115 (1989)).  When such discretionary

authority has been bestowed, the decision to deny benefits is reviewed

under the more deferential standard of arbitrary and capricious, that is,

whether the plan's interpretation "was reasonable and made in good faith."

*Id.* (citation and quotation omitted).  In this circuit, arbitrary and capricious

is "interchangeable" with abuse of discretion.  *Weber v. GE Group Life

Assur. Co.*, 541 F.3d 1002, 1010 n. 10 (10th Cir. 2008)

   The plan administrator's decision is not always afforded full

deference:

> However, we dial back our deference if "a benefit plan gives
> discretion to an administrator or fiduciary who is operating under a
> conflict of interest."  *Metro. Life Ins. Co. v. Glenn*, --- U.S. ----, 128 S.
> Ct. 2343, 2348, 171 L. Ed. 2d 299 (2008) (quoting *Firestone*, 489
> U.S. at 115, 109 S.Ct. 948).  In such a situation, that "conflict should
> be weighed as a factor in determining whether there is an abuse of
> discretion."  *Id.* at 2350 (internal quotation marks omitted) (quoting
> *Firestone*, 489 U.S. at 115, 109 S.Ct. 948); *see also Flinders*, 491
> F.3d at 1189-90.  To incorporate this factor, we have "crafted a
> 'sliding scale approach' where the 'reviewing court will always apply
> an arbitrary and capricious standard, but [will] decrease the level of
> deference given . . . in proportion to the seriousness of the conflict.' "
> *Flinders*, 491 F.3d at 1190 (quoting *Chambers v. Family Health Plan
> Corp.*, 100 F.3d 818, 825-26 (10th Cir. 1996)).  This approach mirrors

the *Glenn* Court's method of accounting for the conflict-of-interest
factor. *See Glenn*, 128 S.Ct. at 2351-52 (explaining that factor should
prove more or less important depending on the conflict of interest's
magnitude).

*Weber v. GE Group Life Assur. Co.*, 541 F.3d at 1010-11 (footnote

omitted).  The Supreme Court in *Glenn* discounted any need for "special

burden-of-proof rules, or other special procedural or evidentiary rules" to

account for this "conflict" factor.  129 S. Ct. at 2351.  Instead, the Court

favored treating the conflict as just one of the relevant factors to be

balanced and according it importance based on the likelihood it "affected

the benefits decision."  *Id.*  In *Weber*, the Tenth Circuit described its

approach of a sliding scale of deference "in proportion to the seriousness of

the conflict" as one that "mirrors the *Glenn* Court's method of accounting

for the conflict-of-interest factor."  541 F.3d at 1010-11 (quotation and

citations omitted).

As the GDP claims administrator, Hartford is a plan fiduciary

"hav[ing] discretionary authority to interpret the terms of the Plan and to

determine eligibility for and entitlement to benefits in accordance with the

plan."  (AR at A0037).  This discretionary authority triggers the arbitrary and

capricious standard of review.  Because Hartford is both the insurer/payer

and claims administrator, it "operates under a conflict of interest in this

26

case." *Weber*, 541 F.3d at 1011 (citing *Glenn*, 128 S. Ct. at 2349-50).

Consequently, the court will "employ the arbitrary and capricious standard,

but . . . weigh . . . [Hartford's] conflict of interest as a factor in determining

the lawfulness of the benefits denial." *Id.*  When a conflict of interest exists,

the reviewing court must "take a hard look at the evidence and arguments

presented to the plan administrator to ensure that the decision was a

reasoned application of the terms of the plan to the particular case,

untainted by the conflict of interest." *DeGrado v. Jefferson Pilot Financial

Ins. Co.*, 451 F.3d 1161, 1168 (10th Cir. 2006) (quotation and citation

omitted).

A decision is arbitrary and capricious if not supported by

substantial evidence.  *Adamson v. Unum Life Ins. Co. America*, 455 F.3d

1209, 1212 (10th Cir. 2006).  On this point, the Tenth Circuit has added:

> Substantial evidence is of the sort that a reasonable mind could
> accept as sufficient to support a conclusion.  Substantial evidence
> means more than a scintilla, of course, yet less than a
> preponderance.  The subtantiality of the evidence is evaluated
> against the backdrop of the administrative record as a whole.

*Id.* (citations omitted).  "In determining whether the evidence in support of

the administrator's decision is substantial, we must take into account

whatever in the record fairly detracts from its weight."  *Caldwell v. Life Ins.*

*Co. of North America*, 287 F.3d 1276, 1282 (10th Cir. 2002) (quotation and citations omitted).

In its review, the court looks only at "the evidence and arguments that appear in the administrative record." *Flinders*, 491 F.3d at 1180 (citations omitted). Thus, the reviewing court considers "only the rationale asserted by the plan administrator in the administrative record and determine[s] whether the decision, based on the asserted rationale, was arbitrary and capricious." *Id.* The rationale on review is that which is "specifically articulated in the administrative record as the basis for denying a claim." *Id.* The decision on review is Hartford's termination of benefits as of December 2005 based on all evidence found in the administrative record and based on the decisions and rationale found in Hartford's written decisions through the conclusion of the administrative appeal process on December 4, 2006. (AR at B0058).

Federal courts do not "function as substitute plan administrators" in their federal review of benefit denials under ERISA. *Jewell v. Life Ins. Co. of North America*, 508 F.3d 1303, 1308 (10th Cir. 2007), *cert. denied*, 128 S. Ct. 2872 (2008). Thus, "the best way for a district court to implement ERISA's purposes in this context is ordinarily to

28

restrict de novo review to the administrative record compiled during the

claim administration process, instead of taking new evidence, hearing

witnesses, and the like."  *Id.* (quotation and citaton omitted).

**ARGUMENTS AND ANALYSIS**

This ERISA case is particularly close and difficult.  The medical

record is extensive but inconclusive as to etiology.  None of the examining

physicians doubted the credibility of Boggio's perceived problems with

dizziness and balance, and most recognized a likely psychological

component that contributed to the subjective severity of the complaints.

The treating physicians made numerous referrals to various specialists who

performed the relevant diagnostic medical tests and evaluated the results.

Despite all these efforts, the record is devoid of a diagnosed physiological

condition that explains the source of the plaintiff's severe complaints of

dizziness.  As for the physicians retained by Hartford, none of them

accepted Boggio's complaints as credible, largely because they found his

complaints inconsistent with the medical testing for a physiological

explanation and because of the video surveillance made during a two-day

investigation that showed some of Boggio's physical activities.  The tipping

point in this close case has certainly been influenced by recent case law

29

concerning the procedure and weight to be given such factors as the

conflict of interest and the SSA determination.  For the reasons more fully

discussed below, the court determines that Hartford's decision to terminate

benefits was arbitrary and capricious.

Conflict of Interest and SSA Determination

As noted above, the Supreme Court in *Glenn* clarified that a

conflict of interest exists when the plan administrator both evaluates the

claim for benefits and pays it and that this conflict still exists when

employer's insurance company is the administrator.  128 S. Ct. at 2348-50.

This conflict of interest is a factor to be weighed along with other "case-

specific factors."  *Id*. at 2351.  "[A]ny one factor will act as a tiebreaker

when the other factors are closely balanced, the degree of closeness

depending upon the tiebreaking factor's inherent or case-specific

importance."  *Id*.   The relative importance of the conflict-of-interest factor

increases "where circumstances suggest a higher likelihood that it affected

the benefits decision."  *Id.*  The Court noted that evidence relevant in this

regard would include a "history of biased claims administration" or

measures "to reduce potential bias or to promote accuracy."  *Id*.

Neither party offers any additional evidence of bias similar to

30

that specifically identified in *Glenn*.  The plaintiff complains that Hartford

relied on the opinions of its consulting physicians who never examined

Boggio and largely discredited the opinions of the treating physicians who

clinically examined Boggio and observed his balance problems.  The Sixth

Circuit "has observed that when a plan administrator both decides claims

and pays benefits, it has a 'clear incentive' to contract with consultants who

are 'inclined to find' that a claimant is not entitled to benefits."  *DeLisle v.

Sun Life Assurance Co. of Canada*, ---F.3d---, 2009 WL 529171 at *3 (6th

Cir. Mar. 4, 2009).  The administrative record certainly confirms that the

consulting physicians gave little credit to what the examining physicians

observed as part of their clinical examinations and chose instead to focus

on the medical testing results that failed to supply an etiology to explain the

seriousness of the plaintiff's dizziness complaints.

　　　　Boggio argues that Hartford acted arbitrarily and capriciously

not only because of a conflict of interest but because of its failure to

consider and account for the SSA disability finding.  The Supreme Court in

*Glenn* found that the Sixth Circuit did accord some weight to the conflict

factor but "focused more heavily on other factors":

> In particular, the court found questionable the fact that MetLife had
> encouraged Glenn to argue to the Social Security Administration that

31

she could do no work, received the bulk of the benefits of her
success in doing so (the remainder going to the lawyers it
recommended), and then ignored the agency's finding in concluding
that Glenn could in fact do sedentary work.  This course of events
was not only an important factor in its own right (because it
suggested procedural unreasonableness), but also would have
justified the court in giving more weight to the conflict (because
MetLife's seemingly inconsistent positions were both financially
advantageous).  And the court furthermore observed that MetLife had
emphasized a certain medical report that favored a denial of benefits,
had deemphasized certain other reports that suggested a contrary
conclusion, and had failed to provide its independent vocational and
medical experts with all of the relevant evidence.  All these serious
concerns, taken together with some degree of conflicting interests on
MetLife's part, led the court to set aside MetLIfe's discretionary
decision.  We can find nothing improper in the way in which the court
conducted its review.

*Id.* at 2352 (citations omitted).   Boggio points to the GDP that required him

to supply proof that he had "applied for other Deductible Income Benefits

such as Workers' Compensation or Social Security *Disability* Benefits."

(AR at A0033).  In November of 2004, he notified Hartford that the SSA

had determined that he was disabled as of April 23, 2004, and that he

would be entitled to benefits beginning in October of 2004.  (AR at C0720-

21).  Boggio argues that Hartford has financially benefitted from the offset

of the Social Security disability benefits but that Hartford ignored the

agency determination.

          In a recent unpublished decision, the Tenth Circuit found the

Supreme Court's approach in *Glenn* "more pertinent" than its prior general

rule of simply recognizing without discussing the different standards

involved in the two determinations, SSA and ERISA.  *Brown v. Hartford Life*

*Ins. Co.*, 301 Fed. Appx. 772, 2008 WL 5102279 (10th Cir. Dec. 5, 2008).

Relying on *Glenn*, the panel discussed the importance of this factor and its

consideration on review:

> Hartford similarly benefitted financially from the SSA's determination
> that Mr. Bown was unable to do any work and should therefore
> receive SSD.  But when Mr. Brown brought this determination to
> Hartford's attention, it merely stated:
>> "We also considered the fact that Mr. Brown was approved for
>> Social Security Disability (SSD) benefits.  The SSD decision is
>> based on specific established rulings, and is not binding on The
>> Hartford, as we must administer his claim based on our policy
>> language and the medical documentation available to us.
> Aplt. App. at 32.
>> Hartford's discussion of this point was conclusory; it provided
> no specific discussion of how the rationale for the SSA's decision, or
> the evidence the SSA considered, differed from its own policy criteria
> or the medical documentation it considered in rejecting Mr. Brown's
> claim.  A reviewing court should have factored the inconsistency
> created by Hartford's instructing Mr. Brown to apply for SSD and
> reaping the benefits of his successful determination, then summarily
> rejecting the evidentiary value of that determination almost without
> comment, into its determination of whether Hartford acted arbitrarily
> and capriciously in denying benefits.  *See Glenn*, 128 S. Ct. at 2352.

301 Fed. Appx. 772, 2008 WL 6102279, at *3.  The Sixth Circuit has

formulated a similar rule:

> Although there is no technical requirement to explicitly distinguish a

favorable Social Security determination in every case,

> [i]f the plan administrator (1) encourages the applicant to apply
> for Social Security disability payments; (2) financially benefits
> from the applicant's receipt of Social Security; and then (3) fails
> to explain why it is taking a position different from the SSA on
> the question of disability, the reviewing court should weigh this
> in favor of a finding that the decision was arbitrary and
> capricious.

*Bennett v. Kemper Nat'l Servs.*, 514 F.3d 547, 554 (6th Cir. 2008).

> . . . Only one of Sun Life's file reviewers even acknowledged in
> his report that he was aware of the Social Security determination.
> Even though Sun Life did not have the opinion accompanying the
> notice of award, it still was well aware of the uniform federal standard
> that applies to Social Security claims.  Sun Life's silence here does
> not make its denial arbitrary per se, but is among those "serious
> concerns" that, "taken with some degree of conflicting interests,"
> provide a proper basis for concluding that the administrator abused
> its discretion.  *See Glenn*, 128 S. Ct. at 2352.

*DeLisle v. Sun Life Assurance Co. of Canada*, 2009 WL 529171 at *4.

The administrative record shows Hartford was aware of the

SSA determination and benefitted from its offset.  (AR at C0098).  Hartford

never mentions the award of SSA disability benefits in any of its decisions.

There is nothing in the administrative record to show that any evidentiary

value was attached to the award or that it was even considered.  While the

SSA decision was not in the administrative record, Hartford certainly knew

"the uniform federal standard that applies to Social Security claims."

*Delisle*, 2009 WL 529171 at *4.  Hartford's failure to consider the SSA

decision is a "serious concern" considered along with Hartford's conflict of

interest, and together they offer a substantial basis for questioning whether Hartford abused its discretion in terminating Boggio's benefits.  *Id.*  (quoting and citing *Glenn*, 128 S. Ct. at 2352).

Objective Medical Findings

The GDP requires a claimant to offer "objective medical findings" in support of the claimed disability.   (AR at A0033).  The plan defines objective medical findings to "include but are not limited to tests, procedures, or clinical examinations standardly accepted in the practice of medicine."  *Id.*  The plaintiff contends Hartford was arbitrary and capricious in terminating benefits in reliance on the opinions of consulting physicians who never examined him and who rejected the clinical examinations of treating physicians because the medical testing did not establish a cause for the severity of the subjective complaints.  In its final decision on appellate review, Hartford quoted the following as the opinion of the consulting physician, Dr. Randall King:

> "there is no information that would clearly objectively support functional limitations.  The video surveillance obviously did not document any vestibular dysfunction.  Therefore, there are no objective findings from examination by the physicians, any physiological testing, any radiographic evidence, or surveillance data that would support a physiological basis for limitations."

(AR at B0060).

The administrative record includes clinical examinations of the plaintiff that sustain his subjective complaints of dizziness and disequilibrium.  From Dr. Mahon who was the plaintiff's primary care physician making the referrals, to the therapist who performed the plaintiff's vestibular rehabilitation, to Dr. Hinrich Staecker at KUMC, each examined the plaintiff and found a balance problem or impairment.  Hartford's last consulting physician, Dr. Randall King, misstated Dr. Staecker's findings in this regard.  In his report, Dr. Staecker wrote:  "Posturography today shows high variability, possibly consistent with a physiologic balance behavior.  I do believe that Mr. Boggio has an underlying balance problem, however, I believe he may be suffering from a conversion type disorder that is causing him to have excessive responses to his vestibular problem."  (AR at C0134, C0136 (underlining added)).  Dr. King, however, summarized Dr. Staecker's report as saying:  "His posturography demonstrated high variability, possibly consistent with a physiological balance behavior.  He did not believe that Mr. Boggio had an underlying balance problem.  He believed that he was suffering from **conversion-type disorder** that was causing him excessive response to his vestibular problem."  (AR at C0010).  Dr. King built upon this misreading by opining that:  "Therefore, in the final

36

analysis, the objective data did not posit a physiological basis for his vertigo or dizziness, and I would tend to agree with Dr. Staecker that this does not have a physiological basis." (AR at C0012 (underlining added)). Hartford certainly was less than critical in its reliance on Dr. King's opinion in light of the GDP's definition of "objective medical evidence" and Dr. King's apparent misreading of Dr. Staecker's medical reports.

Surveillance Recordings

Hartford terminated benefits in December of 2005 based principally on the consulting opinion of Dr. Mercer and the surveillance investigation. The administrative record does not show that Dr. Mercer received any new medical records other than those which had been considered by Hartford's prior consulting physician, Dr. Redfelt. Dr. Mercer did speak with Dr. Mahon and reviewed the surveillance recording. From his review of the medical tests, Dr. Mercer finds that "[t]he minimal findings noted are nonspecific and do not allow determination of a peripheral versus central cause for his dizziness/disequalibrium symptoms." (AR at C0353). Dr. Mercer then contrasts Boggio's reported symptoms with Boggio's activities found on the surveillance recording. Dr. Mercer opines the video shows Boggio to walk and bend "without imbalance." (AR at C0353).

37

From the lack of any significant abnormality revealed in medical testing and the "inconsistencies between self-reported capabilities versus those observed on video surveillance, as well as the references to psychological overlay, the subjective symptoms substantially exceed objective findings and are of questionable reliability."  *Id.* at C0353-C0354.  In short, while Dr. Redfelt, a consulting otolaryngologist, agreed with the assessment of the treating otolaryngologist, Dr. Luetje, Dr. Mercer, the consulting neurologist, reached a different conclusion after reviewing the same medical records and watching less than thirty minutes of surveillance recordings made over a two-day period in September of 2006.

Hartford's other consulting physicians, the otolaryngologist, Dr. Issac Bloch, and the neurologist, Dr. Randall King, likewise placed significant weight on the surveillance recording.  Dr. Bloch considered the investigative report to be "most revealing" and to show the plaintiff "partaking in all of his activities without any sense of hesitancy or restriction."  (AR at C0243).  According to Dr. Block, Boggio "walks quite smoothly without any hesitancy or instability" and is observed "walking into a building with a female who is holding onto his arm for apparent support." (AR at C0242).  In Dr. King's report, he writes that the video surveillance

document's Boggio "walking in a normal manner."  (AR at C0011).

There are several troubling circumstances with the defendant's use and reliance on the video surveillance.  First, the plaintiff correctly notes that neither the video nor the investigative report shows the plaintiff engaged in daily activities comparable to his former job for an eight-hour period.  In describing his symptoms, the plaintiff admits that walking is part of his daily activity even though it causes him nausea and dizziness. "Sometimes I try and walk quickly just to get it over with because it is not a pleasurable experience."  (AR at C0143).  The video does not establish that the plaintiff was free of dizziness while walking or that the plaintiff would not experience dizziness while reading or working on a computer.  At most, the video is a snapshot illustrating the plaintiff's physical abilities over a short period of time and is "only weakly probative of . . . the ability to work an eight-hour day."  *Niles v. American Airlines, Inc.*, 563 F. Supp. 2d 1208, 1223 (D. Kan. 2008).  While the video shows the plaintiff engaged in activities that he had described as causing him dizziness and nausea, the video does not prove the plaintiff was symptom-free.  It only shows that the plaintiff was willing to engage in those activities, at least for brief periods of time, and that the plaintiff's actions did not manifest signs of severe

dizziness or nausea during those brief periods.

Second, the plaintiff submitted to Hartford his analysis of the surveillance recording pointing out how he walks with head leaning forward and looking downward most of the time to limit his visual input.  (AR at C0185).  He notes how his walk is often a flat-footed shuffle to keep his stability.  *Id.*  He further notes how he awkwardly carries his left arm away from his body at one point to keep his balance.  *Id.*  There is nothing of record to show that the consulting physicians were ever provided or considered the plaintiff's notes offering his explanation of the video surveillance.

Third, the court has reviewed the surveillance recording, and it does not show the plaintiff at all times walking normally and without hesitancy or instability.  There are a couple instances in the film when the plaintiff's gait is plainly guarded and uneven and when his arm is extended unnaturally as if to maintain balance.  The video captures Boggio walking slower at times and walking with a flat-footed shuffle and his head bent over as if looking down.  Additionally, the video is inconclusive in showing whether Boggio assisted or helped his former girlfriend, whether she was helping him, or whether they were simply walking together.

40

Finally, Hartford supplied this video surveillance to the
physicians as evidence to assess the plaintiff's capacity for physical
activities.  The consulting physicians plainly considered and used the
recording for that purpose and also to assess the reliability of Boggio's
subjective complaints.  Significantly, the reports of the consulting
physicians do not reveal that Hartford informed them of what the plaintiff's
supervisor had observed about the plaintiff's condition over a period of
thirteen to fifteen months.  In October of 2004, the plaintiff's supervisor, Ms.
Turkington told the Hartford claim representative:

> She states he [Boggio] has been having this problem for about 13 to
> 15 months.  She states that they tried to get him a larger screen
> computer (19 inch), and to enlarge the letter on the screen.  She
> states that the he (sic) was doing expenses from the field people
> (working on a spread sheet with a lot of numbers), can't tuen (sic),
> look down or up, can't focus on what he's doing.  She states that
> when he walks, he holds on to the cubicle and the walls.  She states
> that his balance is so bad.  She states that he cannot see to function
> to do what he's supposed to be doing.  She states that he gets dizzy
> when reading and looking at the computer screen.  She states that
> they don't have anything else for him to do.  She states that the only
> thing that he is able to do is talk on the phone, and there is a small
> amount of the job that requires that, but no enough for him to just do
> that.  She states that it takes him 2 to 3 times longer to do things than
> it should.  She states that they had given him some assignments that
> they had to take away from him.  She states that he can't cross
> reference things on a spreadsheet.  She states that when you talk to
> him, he can't focus on what you are saying, and that he blinks his
> eyes a lot to try to focus.  She states that she has to tell him things 2-
> 3 times.  She states that "he's just not the same Tom he used to be."

41

(AR at C0109).  In March of 2005, Ms. Turkington discussed the plaintiff's

condition again with a Hartford claim representative:

> Theresa also discussed ee condition while working--she said that his
> work started to regress when he went out initially.  She said his duties
> were mostly done while sitting at a computer and he could hardly look
> at the screen.  Also he was not able to walk w/o holding onto the
> walls.  She did not know how he was able to drive the short distance
> from work to home.  She also said that there were times when
> someone would have to drive him home.  She said she did not know
> what type of job he would be able to do since he had trouble walking
> and had trouble just sitting working on the computer.

(AR at C0090).   It is certainly troubling that Hartford and its consulting

physicians accorded substantial weight to a surveillance recording of less

than thirty minutes and an investigative report from two days of surveillance

but completely ignored the observations of the plaintiff's supervisor made

after months of daily contact with Boggio at the workplace.  The

administrative record does not indicate that Hartford ever informed its

consulting physicians of the supervisor's statements.  If it is important and

relevant for physicians to consider how the claimant physically handled

some of the challenges of daily living during a two-day period, then the

physicians should have been provided all the evidence that Hartford

possessed in that regard, in particular, how the claimant handled the daily

challenges of his job as observed over a period of months.

42

The court also would note that there is not substantial evidence to support Hartford's finding:  "Your observed activities during the surveillance for a total of 8 hours and 31 minutes did not demonstrate that you had any vestibular dysfunction."  (AR at B0060).  Triad Investigation's report shows the plaintiff was away from his residence on Sunday, September 25, 2005, for a total of 8 hours and 31 minutes.  (AR at D0003). The report plainly shows the plaintiff was not under constant surveillance for eight hours and 31 minutes that day.  During the morning hours while the plaintiff was at church, the investigator occasionally checked on the plaintiff while he was attending a class.  At noon, the plaintiff left church, and the investigator lost visual contact of the plaintiff and did not resume surveillance until 5:30 p.m. when the plaintiff returned home and went inside.[3]  Hartford has no evidence of the plaintiff being engaged in continuous activities for more than eight hours or for any period even approaching that length without an incident of a vestibular dysfunction.

Treating Physicians and Psychological Disorder

Though not required to give special deference or weight to the opinions of treating physicians, Hartford may not arbitrarily refuse to credit

---

[3]Notably, Hartford ignored Boggio's statement that he spent the remainder of the day at his mother's house.  (AR at C0126).

the opinions.  *See Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003).  A plan administrator may discount a treating physician's report if unsupported by clinical data or medical documentation. *Grosvenor v. QWest Communications Intern.*, 191 Fed. Appx. 658, 2006 WL 2076804 at *5 (10th Cir. 2006); *Kimber v. Thiokol Corp.*, 196 F.3d 1092, 1099 (10th Cir. 1999).

The treating physicians, including Dr. Staecker, opined that the plaintiff has a disequilibrium or balance problem.  The same physicians candidly recognized that the medical testing failed to establish a diagnosis of a physiological cause that would explain the severity of the plaintiff's symptoms.  The consulting and treating physicians largely agreed that the disabling severity of Boggio's symptoms was not proved and could not be explained solely from the objective medical testing.  None of the physicians, however, were of the opinion that the lack of objective medical testing necessarily ruled out any possibility of a physical balance problem or meant the plaintiff was not experiencing any such balance problem. Instead, several of the consulting physicians recognized the likelihood that Boggio may be suffering from depression and/or a psychological disorder which contributed to the balance problem.  The treating physicians also

44

offered the same likelihood as explaining why Boggio was coping so poorly

with his balance problem.  The difference between the groups is that the

consulting physicians who did not examine Boggio concluded from the lack

of objective medical testing and from the short video surveillance recording

that his complaints were largely unreliable and questionable, that the

opinions of the treating physicians could not be credited beyond Boggio's

credibility, and that the evidence of a psychological disorder was

inconclusive.

Other than as an indicator of bias, the court cannot attach much

more legal significance to a plan administrator's decision to have its

consultants evaluate a case involving subjective complaints from the

medical records alone.  Additional evidence of bias is found, however, in the

failure of Hartford and its consulting physician, Dr. Randall King, to credit or

even mention the explanation given by Dr. Mahon, a treating physician, for

believing the plaintiff:

> You [Dr. Mahon] stated you had not been able to explain his
> [Boggio's] dizziness, and therefore, sent him off for an evaluation and,
> in fact, he had been by Dr. Heisler, who did not think that psychotropic
> medications would help.  I stated that it was clear that he did not think
> psychotropic medications would help but if in fact he has a conversion
> disorder that we would not expect psychotropic medicines to help a
> conversion disorder.  You stated that essentially you had tried to work
> this individual up.  You had sent him to a couple specialists.  At the

> present time, you were not certain of his diagnosis, but because of his
> symptoms that he related, you did not believe he would be capable of
> working.  If asked if you believed that he was a person who would
> tend to embellish or you thought he was a pretty reliable person.  You
> stated that prior to the dizziness, he had been an individual who did
> not miss work very frequently and seemed to you to be a person who
> accurately described his symptoms and you had not seen anything in
> your experience that would suggest that he would be malingering or
> tend to embellish.

(AR at C0018-10019).  Thus, Dr. Mahon's acceptance of the plaintiff's

symptoms was not just something expected or required of a treating

physician, but it was based also on his personal knowledge of the plaintiff

gained from years of providing family medical care.  *Cf. Maniatty v.*

*UnumProvident Corp.*, 218 F. Supp. 2d 500, 504 (S.D.N.Y. 2002)

("it [is] not unreasonable for the administrator [of the benefits plan] to

conclude that the only material reason the treating physicians were

reaching their diagnoses was based on their acceptance of plaintiff's

subjective complaints: an acceptance more or less required of treating

physicians, but by no means required of the administrator."), *aff'd*, 62 Fed.

Appx. 413 (2nd Cir.), *cert. denied*, 540 U.S. 966 (2006).

This court is permitted to consider subjective, as well as

objective, evidence of a plaintiff's disability in ERISA cases.  *Ray v. UNUM*

*Life Ins. Co. of America*, 224 Fed. Appx. 772, 786-787 (10th Cir. 2007).  In

approving benefits for the plaintiff in July of 2005, the plan administrator plainly considered and credited the plaintiff's subjective complaints as reflected in Dr. Luetje's opinion and Dr. Redfelt's opinion that frequent head or eye movement in sedentary work would aggravate the plaintiff's disequilibrium and interfere with his ability to perform sedentary work.  Both physicians also opined that psychological overlay contributed to the plaintiff's ability to cope with these feelings of disequilibrium.  In its decision to terminate benefits in December of 2005, Hartford does not refer to any new objective medical testing done on the plaintiff between July and December.  For that matter, Hartford's decision does not refer to any evidence of a diagnosed change in the plaintiff's condition.  Rather, Hartford chose to revisit its decision and reconsider its credibility determinations with the aid of a new consulting physician who reviewed the same medical evidence but with the recently obtained surveillance recording.

After the termination of benefits, additional medical testing was done in June of 2006, but the results again failed to provide a physiological diagnosis to explain the severity of the plaintiff's subjective symptoms.  Dr. Staecker with the KUMC, however, believed that plaintiff did have "an underlying balance problem" and that "he may be suffereing from a

47

conversion type disorder that is causing him to have excessive responses to his vestibular problem." (AR at CO136). On Dr. Staecker's referral, Boggio was given a neuropsychological assessment, and the psychologist diagnosed an "undifferentiated somatoform disorder" an "anxiety disorder." (AR at C0063). The psychologist recommended "[p]sychological counseling with a cognitive-behavioral approach" and also a "psychiatric consultation to assist in selection of medication for attention and concentration." *Id.* A month later, Boggio was seen by Dr. Norman Heisler for a psychiatric consultation, and Dr. Heisler opined: "Overall, it would not appear that his symptoms are primarily psychiatric and I have not elected treatment. I did advise him to follow up with a neurologist with special expertise in this area or to return to ear, nose, and throat doctor." (AR at C0065 (underlining added)). Dr. Heisler did not prescribe any psychotropic medications as it was "not clear" they would alleviate the plaintiff's symptoms. *Id.*

Hartford referred to this evidence but characterized Dr. King's report as finding "that he was unable to clearly state whether or not there is a psychiatric basis due to the conflicting psychiatric and psychological testing however clearly stated there is not a physiological basis for your complaints of chronic dizziness." (AR at B0060). Dr. King, however,

48

reported, "it is likely that he has a conversion or somatoform-type disorder. I would also agree with Dr. Deutche that he has a somatoform disorder and anxiety." (AR at C0013). Dr. King recognized that from the data he could not state whether the plaintiff was malingering or suffering from somatoform disorder or a conversion disorder, so he "would defer to a psychiatrist or neuropsychologist." (AR at C0013). Thus, the court cannot find substantial evidence to support Hartford's finding: "As far as any psychiatric basis for impairment, the evidence is conflicting *however does not appear to be the cause of any functional impairment.*" (AR at B0060) (italics added).

Conclusion

After considering all of the evidence outlined and discussed above, the court concludes that Hartford's decision to terminate Boggio's benefits was not a reasoned and principled application of its policy terms that was supported by substantial evidence. Besides having a conflict of interest, Hartford knew of the SSA disability determination, financially benefitted from Boggio's disability award, but never considered or explained why it was taking a different position and not attaching any evidentiary value to the award. In its final decision, Hartford largely credited the findings of Dr. King who employed a definition of "objective medical findings" that was

49

narrower than the GDP and who misread and misapplied the reported findings of Dr. Staecker.  Hartford and its consulting physicians attached undue weight to a surveillance recording that was probative, at best, in showing the severity of the plaintiff's symptoms while engaged in certain non-work related activities for brief periods.  The administrative record shows the surveillance recording was principally the only new evidence considered by Hartford and its consulting physicians before terminating the plaintiff's benefits.  Such reliance on the video recording indicates selective consideration of the record, for there is no mention of the plaintiff's notes explaining the video.  Moreover, there is nothing in the record to explain why Hartford and its consulting physicians would place so much significance on a surveillance recording of less than thirty minutes and an investigative report based on less than five total hours of actual visual surveillance of the plaintiff's activities over a two-day period, while completely ignoring the statement of the plaintiff's supervisor made after months of daily contact with Boggio at the workplace.  Contrary to Hartford's final decision, there is no substantial evidence that the plaintiff engaged in activities for a total of eight hours and 31 minutes without any vestibular dysfunction.  Finally, the record is replete with evidence that the plaintiff

50

suffers from a psychological disorder that interferes with his ability to cope with his balance problem.  The opinion of Dr. Heisler certainly does not rule out this disorder being a contributing factor to the plaintiff's impairment. Considering all these factors together, the court is convinced that Hartford's decision to terminate benefits does not reflect a principled, deliberative reasoning process and, thus, is properly described as arbitrary and capricious.

The plaintiff asks the court to retroactively reinstate benefits under the GDP from January 1, 2006.  The court does not find the defendant to have argued a position on this issue in its opposition to the plaintiff's motion.   The general rule is that a retroactive reinstatement is the proper remedy when "but for the plan administrator's arbitrary and capricious conduct, the claimant would have continued to receive the benefits" subject to all applicable set-offs (Social Security,  Workers' Compensation, etc.) provided in the GDP.  *See  DeGrado v. Jefferson Pilot Financial Ins. Co.*, 451 F.3d at 1176 (quotation and citation omitted).  The court has been presented with no arguments or reasons for concluding otherwise.

The plaintiff also asks for attorney's fees and costs pursuant to

51

20 U.S.C. § 1132(g)(1).  The award of fees is determined upon five factors:

"a party's culpability or bad faith; its ability to satisfy an award of fees; the

deterrence value of an award; the number of plan participants affected by

the case or the significance of the impact of the legal question involved; and

the relative merits of the parties' positions.  *Graham v. Hartford Life and*

*Accident Ins. Co.*, 501 F.3d 1153, 1162 (10th Cir. 2007) (quotation and

citation omitted), *cert. denied*, 128 S. Ct. 1650 (2008).   The Tenth Circuit

gives some "weight to prevailing party status, even though . . . the ERISA

attorney's fees provision is not expressly directed at prevailing parties."  *Id.*

         The weight of the factors does not favor an award of fees and

costs.  As discussed above, the medical testing failed to provide an etiology

for the plaintiff's severe symptoms which justified Hartford taking a closer

look.  Its retention of numerous consulting physicians certainly suggests

good faith, even though Hartford did encourage a selective consideration of

the record.  While this case does implicate a plan administrator's proper use

and consideration of a surveillance recording, the facts of this case are

certainly unique with regard to the plaintiff's subjective symptoms and

involvement of a psychological disorder.  Consequently, an award of fees

would not carry a clear message of deterrence.  The court denies the

plaintiff's request for fees and costs.

IT IS THEREFORE ORDERED that defendant Hartford's motion for summary judgment (Dk. 28) is denied;

IT IS FURTHER ORDERED that the plaintiff's motion for summary judgment (Dk. 30) is granted in part, the defendant's decision to terminate benefits is reversed, and the defendant is ordered to reinstate retroactively from January 1, 2006, all benefits payable to the plaintiff and rights under the GDP and subject to all applicable set-offs (Social Security, Workers' Compensation, etc.) as provided therein.  The plaintiff is denied fees and costs pursuant to 20 U.S.C. §  1132(g).

Dated this 25th day of March, 2009, Topeka, Kansas.


s/ Sam A. Crow
Sam A. Crow, U.S. District Senior Judge